**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF KENTUCKY**
**NORTHERN DIVISION**
**AT COVINGTON**

**CRIMINAL ACTION NO. 19-17-DLB-CJS**

**UNITED STATES OF AMERICA**                                                                 **PLAINTIFF**

**v.**                          **MEMORANDUM OPINION AND ORDER**

**JUSTIN ALAN SCOTT**                                                                          **DEFENDANT**

\* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*  \* \*

# I.      INTRODUCTION

This matter is before the Court on Defendant's Motion to Suppress all evidence seized during a search of the Defendant by police on January 2, 2019.  (Doc. # 16).  In his brief in support of his Motion, Defendant Scott alleges that the police officers lacked a legal basis to search his person.  (Doc. # 35 at 9).  Scott therefore argues that all evidence seized during the search should be suppressed.  (Doc. # 16 at 1).

On May 30, 2019, the Court held an evidentiary hearing on the Motion.  (Doc. # 30).  Defendant Scott was present at the hearing and represented by attorney James West.  *Id.*  The United States was represented by Assistant United States Attorney Jennifer Weinhold.  *Id.*  The hearing was recorded by Official Court Reporter Joan Averdick.  Following the evidentiary hearing, the parties submitted supplemental briefs as ordered by the Court.  (Docs. # 35 and 36).  The matter being briefed, and the Court having independently reviewed the entirety of the evidence and heard argument and testimony from each side, the Motion is now ripe for the Court's review.  For the reasons set forth herein, Defendant's Motion to Suppress (Doc. # 16) is **granted**.

1

## II.    FINDINGS OF FACT

Three witnesses testified during the evidentiary hearing on behalf of the United States: Drug Enforcement Agency (DEA) Task Force Agent Andy Muse, Federal Bureau of Investigation (FBI) Task Force Agent T.C. Rice, and City of Maysville Officer Jesse Pollitt.  One witness testified on behalf of the Defendant: Sean Myrick.  Weighing the credibility of the witnesses and reviewing the submitted evidence, the Court makes the following factual findings:

1.    On January 2, 2019 Agent Muse was surveilling the Ye Olde Dutch Inn ("Dutch Inn" or "Inn") in Maysville, Kentucky.  (Doc. # 34 at 10:22-11:11).  Specifically, Agent Muse was monitoring a pole camera directed at the Dutch Inn and its parking lot, via a livestream to his iPad.  *Id.* at 11:9-22; *see also* Gov't Ex. 1.  Agent Muse testified that the Dutch Inn is a location known for drug trafficking.  (Doc. # 34 at 20:13-17).

2.    During his surveillance, Agent Muse observed Defendant Scott outside the Dutch Inn.  (Doc. # 34 at 14:11-20).

3.    At some point during the afternoon a maroon vehicle arrived in the Dutch Inn parking lot.  *Id.* at 3:39:46 (time at which camera zooms out so the entire parking lot, including the maroon vehicle, is visible).  Police determined that Derick Ziegler was the driver of the maroon vehicle.  (Doc. # 34 at 16:9-14, 16:24-17:1).  Police involved in the surveillance believed that Ziegler was a convicted drug dealer.[1]  *Id.* at 18:2-7, 31:12-14.

---

[1]    This information, however, was incorrect.  Derick Ziegler had previously been charged with drug trafficking, but the grand jury later downgraded the charge to possession.  *See Commonwealth v. Ziegler*, Case No. 17-F-00107 (Mason District Court) (showing that Ziegler had been initially charged with one count of drug trafficking and one count of possession, but the grand jury amended the charges to two possession charges).  Ziegler ultimately pled guilty to two counts of drug possession.  (Doc. # 35-1); *see also Commonwealth v. Ziegler*, Case No. 17-CR-0096 (Mason Circuit Court).

4.      At about 4:39 p.m. Agent Muse observed Scott get into the passenger side of the maroon vehicle parked in the Dutch Inn parking lot.  *Id.* at 4:38:44; *see also* (Doc. # 34 at 16:9-14, 17:12-16).  Defendant Scott was in the maroon vehicle with Ziegler for approximately two minutes before exiting and returning to the silver sedan.  (Gov't Ex. 1 at 4:38:44-4:41:06); *see also* (Doc. # 34 at 17:12-16).

5.      Agent Muse believed Defendant Scott's actions in relation to Ziegler were indicative of a hand-to-hand drug transaction, (Doc. # 34 at 21:21-22:1), and relayed this information to Agent Rice.  *Id.* at 22:2-8, 35:9-18, 39:21-24, 49:1-10.

6.      Upon exiting Ziegler's vehicle, Scott returned to the silver sedan in which he arrived.  (Gov't Ex. 4:41:18).  The silver sedan carrying Justin Scott then left the parking lot.  *Id.* at 4:41:57.  The driver of the sedan attempted to turn left onto a one-way street, but quickly turned back into the Dutch Inn parking lot when a police cruiser was driving the wrong way down the street.  *Id.* at 4:42:12-4:42:22; *see also* (Doc. # 34 at 19:3-8).

7.      In an attempt to coordinate a traffic stop of the vehicle in which Defendant Scott was travelling, Agent Muse provided identifying and location information about the silver sedan to Agent Rice, who was also in the area.  *Id.* at 35:13-36:2.  After the silver sedan left the parking lot of the Dutch Inn, it was followed by Agent Rice and two detectives (Detective Conley and Detective Burns) who were in an unmarked car.  *Id.* at 33:6-36:19, 54:19-55:5.  During the surveillance of the vehicle, the officers observed the sedan make a left turn into an oncoming turn lane.  *Id.* at 36:24-37:4, 59:14-17.  At some point while observing the silver sedan Detective Burns contacted Maysville Police Officer Pollitt, who drove a marked police car, to coordinate an encounter between Officer Pollitt

and the Defendant.  *Id.* at 35:24-36:7, 59:7-17.  Shortly after, Agent Rice observed the sedan pull into the parking lot of Bubby's Burgers.  *Id.* at 37:17-22.

8.      Agent Rice and Detective Burns approached the silver sedan in the parking lot of Bubby's Burgers and ordered the occupants out of the car.  *Id.* at 38:8-24.  Agent Rice first spoke with the driver of the car, who indicated that the car was not hers and did not give consent for the car to be searched.  *Id.* at 38:25-39:9, 45:2-4.  Agent Rice subsequently spoke with Defendant Scott who refused to give consent for the car to be searched.  *Id.* at 39:10-14.  At some point during this time Detective Conley and Officer Pollitt also arrived on the scene.  *Id.* at 39:2-4.

9.      Within five to ten minutes of arriving on the scene, Agent Rice, having learned that no officer had patted down Defendant Scott and having reason to believe that Defendant Scott was engaged in criminal conduct, conducted a pat-down of the Defendant and discovered a gun in the waistband of Defendant Scott's pants.  *Id.* at 39:10-20, 40:13-16, 49:1-10, 57:2-9.

10.     Officer Pollitt subsequently searched Defendant's person and found a pill bottle containing contraband, including crack cocaine, Xanax, and marijuana.  *Id.* at 40:19-41:8, 57:18-22, 58:6-11.

11.     At some point after the gun was found, the Defendant was handcuffed and arrested for carrying a concealed weapon.  *Id.* at 41:11-15, 57:14-58:4.

In adjudicating the Motion to Suppress, the Court took great care to review the entirety of the surveillance video provided by the Government, rather than merely relying on the testimony and short segment of the video played during the evidentiary hearing. In its review, the Court found several inconsistencies between Agent Muse's testimony

and what actually occurred on January 2, 2019 in the Dutch Inn parking lot. The Court makes the following specific findings based on this review:

12. Agent Muse testified that he observed "Mr. Ziegler [ ] do drug transactions with at least three or four people prior to Mr. Scott." *Id.* at 20:18-19. He specifically testified that "[t]hey were doing the exact same thing . . . [Ziegler] would meet with them, and they would jump in the vehicle with him, in the passenger side, be in there for a short period of time, and then exit the vehicle and leave." *Id.* at 20:22-25. Agent Muse also testified that he "observe[d] one individual walk up to [Ziegler's] driver's side window and approach him and do a transaction there." *Id.* at 21:1-3.

13. Agent Muse's testimony does not comport, however, with the entirety of the surveillance footage that the Court reviewed. Only two other individuals were in Ziegler's car that afternoon, and each spent significant time in the maroon vehicle; this is inconsistent with Agent Muse's suggestion that three or four people got into the passenger-side of Ziegler's car for a short time. Agent Muse's recollection of an individual coming up to Ziegler's driver-side window, however, is consistent with the video. Having reviewed the video, the Court finds the following regarding other individuals who interacted with Ziegler when he was in the maroon vehicle on January 2, 2019 at the Dutch Inn:

a. Ziegler and another individual (Person 1) got into the maroon vehicle at approximately 3:53 p.m.—Ziegler was in the front driver seat and Person 1 was in the passenger-side back seat. (Gov't Ex. 1 at 3:53:44-3:53:55). Ziegler left the vehicle at approximately 3:54 p.m., returned less than a minute later, and opened the front driver-side window. *Id.* at 3:54:53-3:55:29. A second individual (Person 2) went to the

passenger-side front door of the maroon vehicle at 3:57 p.m. *Id.* at 3:57:23. Person 2 appears to get into the maroon vehicle's passenger seat for about one minute. *Id.* at 3:57:23-3:58:23. Person 2 gets out of the vehicle for less than two minutes, and then gets back into the front passenger seat at 4:00 p.m. *Id.* at 3:58:23-4:00:16. Ziegler and Person 2 eventually exit the maroon vehicle at 4:30 p.m. and Ziegler got back in the front seat of his vehicle one minute later. *Id.* at 4:30:24-4:31:32. In reviewing the video it does not appear to the Court that Person 1 ever exited the maroon vehicle.

      b.    While the above is going on, a white car appeared in the parking lot next to the maroon vehicle. *Id.* at 3:55:18. A woman exited the white car, briefly walked over to the front of the Dutch Inn, and then walked back to her car. *Id.* at 3:55:20-3:55:58. She walked up to the open front window of Ziegler's maroon vehicle at approximately 3:56 p.m. and had some type of interaction with Ziegler; part of the time she was standing next to the maroon vehicle's open front driver-side window, and for the remainder of the interaction she was standing by the front driver-side door of her white car. *Id.* at 3:56:14-4:01:37. By 4:01 p.m. she was back in her car and leaving the scene. *Id.* at 4:01:37; *see also* (Doc. # 34 at 21:1-3).

      14.    Agent Muse also testified that he never saw Scott go into the Dutch Inn. *Id.* at 19:24-20:1. The surveillance-video footage shows, however, that Scott went into the establishment three times that afternoon. Defendant Scott arrived at the Dutch Inn in a silver sedan at approximately 3:24 p.m. and went inside. (Gov't Ex. 1 at 3:24:05-3:24-44). Scott came out of the Dutch Inn about 12 minutes later. *Id.* at 3:36:37. Over the course of the afternoon, Scott entered and exited the establishment twice more. *Id.* at 3:36:37-4:31:39.

## III. ANALYSIS

Defendant Scott seeks to suppress the weapon recovered from his waistband. In doing so, Scott argues that the officers did not have probable cause to arrest and search him and did not have reasonable suspicion of ongoing criminal activity to conduct a *Terry* stop. For the reasons articulated herein, Defendant's Motion will be **granted** because Agent Rice did not have a reasonable suspicion that Defendant Scott was involved in ongoing criminal activity to stop Scott pursuant to *Terry*. Further, Agent Rice did not have probable cause to arrest the Defendant and search him incident to that arrest. Accordingly, the stop of the Defendant, which ultimately resulted in the finding of a firearm, was unconstitutional under the Fourth Amendment and the evidence seized during that search will be suppressed.[2]

### A. There was no reasonable suspicion of ongoing criminal activity that would have justified a stop of the Defendant.

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), law enforcement may briefly "detain a person or property for investigative purposes if the officer has reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur." *United States v. M. Davis*, 514 F.3d 596, 607-08 (6th Cir. 2008) (quoting *United States v. K. Davis*, 430 F.3d 345, 354 (6th Cir. 2005)). In determining whether a stop was permissible under *Terry*, a Court must first consider whether there was reasonable suspicion for the investigatory detention. *Id.* (explaining the two-part inquiry in determining the constitutionality of a *Terry* stop). A law-enforcement officer must have a

---

[2] Agent Rice having admitted that law enforcement did not initiate a stop of the silver sedan for the alleged moving violation, (Doc. # 34 at 42:23-43:4), the Court focuses its analysis on the authority of law enforcement to stop Defendant Scott to investigate ongoing criminal activity rather than the presence or absence of a valid traffic stop.

particular and objective basis and, more specifically, must be able to provide articulable facts which give rise to a reasonable suspicion that the person is involved in criminal activity. *United States v. Keith*, 559 F.3d 499, 503 (6th Cir. 2009) (citing *United States v. Cortez*, 449 U.S. 411, 417-18 (1981); *M. Davis*, 514 F.3d at 608); *see also United States v. Young*, 707 F.3d 598, 603 (quoting *K. Davis*, 430 F.3d at 354) ("To test an officer's right to initiate a *Terry* stop, we ask 'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion' of criminal activity.").

"Ambiguous behavior does not give rise to reasonable suspicion because 'reasonable suspicion looks for the exact opposite of ambiguity.'" *Young*, 707 F.3d at 603 (quoting *United States v. Beauchamp*, 659 F.3d 560, 571 (6th Cir. 2011)). Reasonable suspicion looks for "objective and particularized indicia of criminal activity." *Beauchamp*, 659 F.3d at 571. An officer is permitted to draw reasonable inferences from the facts based on his or her experiences in law enforcement but must have more than a "hunch" that criminal activity has occurred. *United States v. Urrieta*, 520 F.3d 569, 573 (6th Cr. 2008) (quoting *Terry*, 392 U.S. at 27). "The Fourth Amendment simply does not allow detention based on an officer's 'gut feeling' that a suspect is up to no good." *Id.* at 578. (quoting *Terry*, 392 U.S. at 21, 27, 30).

Whether an officer has reasonable suspicion is determined by considering the "totality of the circumstances" and "all of the information available to law enforcement officials at the time." *Id.* (quoting *Feathers v. Aey*, 319 F.3d 843, 848-49 (6th Cir. 2003)). In determining whether reasonable suspicion exists, "police officers [are allowed] to draw reasonable inferences from their observations in light of their specialized training and

experience." *United States v. T. Jones*, 562 F.3d 768, 776 (6th Cir. 2009). "Reasonable suspicion does not materialize merely because a person 'looked suspicious' and was in a 'high drug problem area.'" *Keith*, 559 F.3d at 503 (quoting *Brown v. Texas*, 443 U.S. 47, 49, 52 (1979)). But, "factors that appear innocent in isolation may combine to form circumstances that, as a whole, support a finding of reasonable suspicion." *Id.* at 504 (citing *United States v. Arvizu*, 534 U.S. 266, 273-75 (2002)). A determination of whether reasonable suspicion exists is so fact-specific that "one determination will seldom be useful precedent for another." *United States v. Torres-Ramos*, 536 F.3d 542, 553 (6th Cir. 2008) (quoting *United States v. Townsend*, 305 F.3d 537, 542 (6th Cir. 2002)).

Here, law enforcement in Maysville appeared to focus on three indicators in determining that they had reasonable suspicion that Defendant Scott was involved in criminal activity: (1) the Dutch Inn parking lot is known for drug trafficking, (2) Defendant Scott got into Ziegler's car for one to two minutes, and (3) Ziegler had been previously convicted[3] of drug trafficking. (Doc. # 34 at 18:1-7, 20:15-21:7, 21:15-22:1-6). Law enforcement did not have a confidential informant in the car with Scott and Ziegler, nor was law enforcement tipped off to any drug activity in the parking lot of the Dutch Inn that day. Moreover, in contrast to Agent Muse's testimony, Defendant Scott did patron the Dutch Inn establishment—entering the bar three times over the course of the afternoon. Further, Agent Muse, the surveilling officer, never saw any physical evidence which would

---

[3] Court records from Mason County indicate that, while Ziegler was at one time charged with a drug-trafficking offense, the grand jury in that County downgraded the offense to possession. Ziegler ultimately pled guilty to two counts of possession; he was never found guilty of drug trafficking as Agent Muse incorrectly suggested. *See Commonwealth v. Ziegler*, Case No. 17-F-00107 (Mason District Court); *Commonwealth v. Ziegler*, Case No. 17-CR-0096 (Mason Circuit Court).

indicate a hand-to-hand transaction; specifically, he did not see an exchange of drugs or money.  *Id.* at 24:1-14.

The government claims that law enforcement also relied on the fact that Agent Muse observed multiple similar interactions between Ziegler and others that day, and that the silver sedan carrying Scott evaded police when leaving the Dutch Inn.  (Doc. # 36 at 6-7).  For the reasons explained *infra*, these two factors do not provide reasonable suspicion of ongoing criminal activity in this instance.  Additionally, while the entirety of the surveillance video shows a flurry of activity in the Dutch Inn parking lot on the day in question, the Court focuses only on the facts that law enforcement testified were relied upon in determining there was sufficient evidence to conduct a stop of Scott.  *See K. Davis*, 430 F.3d at 354 (explaining that reasonable-suspicion analysis first looks at whether an officer was aware of specific, articulable facts giving rise to that suspicion).

The Court acknowledges that this issue is a relatively close call and there is no on-point precedent from this Circuit.  In reviewing the somewhat analogous cases, however, and considering the facts observed by Agent Muse and relied on by law enforcement,[4] the Court concludes that these facts alone do not amount to reasonable suspicion, let alone probable cause.

In a number of cases the Sixth Circuit has found that an apparent hand-to-hand drug transaction in an area known for trafficking *plus* some other factor like attempting to evade the police or having a reliable tip of drug dealing, was sufficient evidence to find reasonable suspicion of ongoing drug activity.  *See, e.g.*, *United States v. J. Jones*, 673

---

[4]     The Court imputes Agent Muse's knowledge of what happened to the other officers that he was working with at the time (the ones who actually stopped Scott).  *Alexander*, 528 F. App'x 515, 519 (citing *United States v. Woods*, 544 F.2d 242, 260 (6th Cir. 1976)).

F.3d 497, 500, 502 (6th Cir. 2012) (finding reasonable suspicion when law enforcement saw a hand-to-hand transaction in a high drug crime area, defendant ran away from police, and threw a paper bag and other items when running); *United States v. Paulette*, 457 F.3d 601, 602, 606 (6th Cir. 2006) (finding reasonable suspicion "based upon his hand movements consistent with drug-dealing activity [law enforcement saw some type of hand-to-hand transaction], efforts to evade police upon noting them, and presence in a high crime area").  It is important to note, however, that presence in a high-crime area cannot be given undue weight.  *United States v. M. Johnson*, 620 F.3d 682, 692-93.  This is particularly true when law enforcement "observed no conduct from [the defendant] consistent with drug activity."  *Id.* at 693.

There appears to be a trend in similar cases where reasonable suspicion was found; law-enforcement officers *actually saw* some type of transaction, interaction, or exchange between two people which appeared to be, or indicated, a drug transaction. *See, e.g.*, *United States v. Alexander*, 528 F. App'x 515, 516, 519 (6th Cir. 2013) (finding reasonable suspicion when officers saw something exchanged between the defendant and another person, the defendant was parked at a gas pump but never purchased gas, and police were responding to a call about "drug activity"); *United States v. S. Johnson*, No. 3:17-cr-00114, 2019 WL 3231382, at *5-6 (M.D. Tenn. July 18, 2019) (finding reasonable suspicion when, after individual got into the passenger side of a car, a detective approached the car and saw the individuals exchange money for a plastic bag that the individual attempted to conceal when police approached).

Out-of-circuit precedent also supports a finding of reasonable suspicion or probable cause when officers observed some type of exchange occur.  *See, e.g.*, *United*

*States v. Flores*, 888 F.3d 537, 541, 544 (1st Cir. 2018) (explaining that after receiving a reliable tip about drug trafficking at a hotel, a state trooper seeing the appellant get into the back seat of a car, "make an exchange with the front-seat passenger," count his money, and exit the car within 20 to 30 seconds was one factor in determining that probable cause existed to arrest the appellant); *United States v. Rivera*, 101 F. App'x 166, 168, 170 (7th Cir. 2004) (finding reasonable suspicion when, among other things, law enforcement saw an individual get into another's car and then hand the driver a "bundle of cash"); *Morales v. Greiner*, 381 F.3d 47, 47-48 (2d Cir. 2004) (denying a certificate of appealability, and noting that the defendant touched hands with multiple individuals and law enforcement saw an individual leave an alleged transaction with an envelope sometimes used to package drugs so there was probable cause to support the defendant's arrest).

In some cases, law enforcement's observation of an actual exchange of drugs for money in a high-crime area, even without more, was enough to find reasonable suspicion. *See United States v. A. Johnson*, 627 F.3d 578, 584 (6th Cir. 2010). In others, however, seeing something that appears to be a hand-to-hand drug transaction, among other factors, was not enough to support a finding of reasonable suspicion. *Patterson v. City of Cleveland*, 173 F.3d 429, 1999 WL 68576, at *6 (6th Cir. 1999) (per curiam) (unpublished table decision) (denying qualified immunity for a police officer who stopped the plaintiff on the grounds of reasonable suspicion when she observed two men in "a high crime area . . . merely 'appear[]' to be exchanging something" and then walk quickly away when a police car approached"). In the context of hand-to-hand drug transactions,

the Sixth Circuit appears to place great weight on law enforcement actually seeing some type of transaction.

Additionally, in some cases where reasonable suspicion was found, law enforcement officers were responding to some complaint of drug activity or other illegal activity which weighed in favor of a finding of reasonable suspicion. *See, e.g.*, *Alexander*, 528 F. App'x at 516, 519-20 (finding reasonable suspicion when a complaint of drug activity was received, among other things, and distinguishing *Alexander* from cases where law enforcement did not receive an initial complaint of illegal activity and did not see movement consistent with drug activity). In other cases where drug dealing allegedly occurred in a retail establishment's parking lot, courts took into account whether the defendant went into or purchased something from the establishment. *See, e.g.*, *id*. (finding reasonable suspicion and noting that the defendant, parked in a gas station parking lot and next to a gas pump, did not purchase gas); *United States v. McCoy*, 513 F.3d 405, 408, 412-13 (4th Cir. 2008) (finding reasonable suspicion after taking into account, among other things, that the defendant moved his truck from one grocery store parking lot to another within one mile of each other, and did not go into either grocery store).

Here, no direct evidence of a drug deal was observed by law. Although he believed a drug deal was occurring, Agent Muse acknowledged that the windows of the maroon vehicle were tinted and he had no idea what, if anything, actually transpired between Defendant Scott and Ziegler when they were in Ziegler's vehicle together. The Court finds this to be a crucial distinction. In *Keith*, officers stopped the Defendant after seeing the Defendant and another individual interact in the parking lot of a convenience store, glance

at two nearby police cars that had lights flashing, and then proceed to the back of the convenience store where they were out of sight of the police for a short period of time. The Circuit highlighted the fact that "the officers did not witness any act that arguably appeared to be illegal" noting that the defendant and the other individuals "could have been neighborhood acquaintances . . . [or the individual] might have leaned into Keith's car window to greet him or to ask if he knew why police cars with flashing lights were gathered on the corner." *Id*. at 506. In fact, "[t]he two men might have had no further contact in the parking lot on the opposite side of [the convenience store], or they might have exchanged a few innocuous words." *Id.*

Although Agent Muse believed that Scott and Ziegler engaged in a hand-to-hand drug transaction with each other in the vehicle, there was no actual evidence of what transpired. Law enforcement was not able to see into the vehicle and did not have an informant or recording device in Ziegler's vehicle. (Doc. # 34 at 26:23-27:2). Similar to *Keith*, law enforcement had no evidence of what actually happened during the interaction between Scott and Ziegler. Agent Muse's belief is simply not enough under the circumstances presented here. Moreover, there was no indication that law enforcement in Maysville received any type of tip regarding illegal drug activity on that day in the Dutch Inn parking lot, and Scott entered the Dutch Inn three times that afternoon. The Court finds that the mere observation of an interaction between two people in a high drug-crime area, with no evidence other than the officer's belief that it was a drug transaction, is not sufficient to support a finding of reasonable suspicion. *See supra.*

The Government suggests that the observation of multiple similar transactions in the parking lot that day, which law enforcement believed to be drug transactions, supports

a finding of reasonable suspicion of criminal activity. (Doc. # 36 at 5). Agent Muse seemed to suggest that he drew a reasonable inference, based on his training and experience and in light of other similar interactions he observed that day, that Scott entered Ziegler's vehicle to buy drugs. Specifically, Agent Muse testified that he believed Scott and Ziegler engaged in a hand-to-hand drug transaction because at least three to four similar transactions with Ziegler—someone getting into the passenger side of Ziegler's vehicle for one to two minutes, exiting the vehicle and leaving the scene—had occurred that day. (Doc. # 34 at 20:15-21:7). This testimony, however, is not supported by the entire surveillance video provided to the Court, *see* (Gov't Ex. 1), and reasonable suspicion is to be "decided on reality and not on fiction." *Beauchamp*, 659 F.3d at 571.

In reviewing the entirety of the surveillance video, only one female individual engaged in a short interaction with Derick Ziegler through the front, driver-side window of his vehicle. *Id.* at 3:55:18-4:01:37. The video does not show anything being exchanged between Ziegler and the female, however, and Agent Muse admitted that drug transactions rarely take place in plain view. Based on this testimony, and without further evidence (like an indication that money was exchanged), the Court finds it unlikely that the interaction between Ziegler and the female was a drug transaction.

The Court, in reviewing the video submitted by the Government, additionally saw Person 2 get in and out of Ziegler's car at least twice. *Id.* at 3:57:23-4:30:24. While he was in the car for a very short period the first instance (approximately one minute), he returned to the car two minutes later and spent nearly thirty minutes in the maroon vehicle the second time. *Id.* He also returned to the maroon vehicle and drove away in it with Ziegler (and presumably Person 1). *Id.* at 4:41:13. While Person 2 was in Ziegler's car

for a short period of time at first, given Agent Muse's testimony that a very short period of time in another's car before leaving the scene may be indicative of a hand-to-hand drug transaction and because Person 2 returned to the maroon vehicle for a long period of time and then left the scene in the same vehicle, the Court finds it unlikely that Ziegler and Person 2 were merely engaging in a hand-to-hand transaction.  Additionally, Person 1 appeared to be in Ziegler's car for over an hour that afternoon (he got into Ziegler's car at 3:53 p.m. and never appeared to exit).  This is also inconsistent with Agent Muse's description of quick hand-to-hand drug transactions.  In summary, these three interactions are inconsistent with Agent Muse's testimony that three or four people got into Ziegler's car for one to two minutes and then left the Dutch Inn on January 2, 2019.  This undermines the Government's argument that police reasonably inferred Scott was engaged in a hand-to-hand drug transaction with Ziegler because similar transactions occurred in the Dutch Inn parking lot that day.

The Government also argues that Defendant Scott's evasion of law enforcement should factor into a finding of reasonable suspicion.  (Doc. # 36 at 6).  However, the Court finds this unpersuasive.  The Supreme Court has found that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."  *Illinois v. Wardlow*, 528 U.S. 119, 124.  In particular, "headlong flight . . . is the consummate act of evasion."  *Id*.  In the driving context, for example, the Sixth Circuit has found a failure to obey traffic laws (like stop signs and traffic signals), driving particularly slowly, and taking an unusual, circuitous route to be indicative of evasive driving.  *United States v. S. D. Johnson*, 631 F. App'x 299, 304 (6th Cir. 2015); *Unites States v. Craig*, 306 F. App'x 256, 258 (6th Cir. 2009); *United States v. Helm*, 85 F. App'x 475, 476-77 (6th Cir. 2004).  The Supreme Court

highlighted while discussing evasion, however, that "the determination of reasonable suspicion must be based on commonsense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. The Court takes note of the Supreme Court's statement in making the determination that evasion did not occur here.

Testimony elicited from law enforcement regarding evasion was consistent with the surveillance video. The silver sedan in which Defendant Scott was traveling attempted to turn left onto Fourth Street—a one-way street—and immediately turned back into the Dutch Inn parking lot upon seeing a police cruiser driving the *wrong way* down Fourth Street toward the sedan. (Doc. # 34 at 19:3-6); (Gov't Ex. 1 at 4:41:56-4:42:22). While the Court recognizes that the silver sedan was "evading" the police cruiser by moving out of its way and then exiting the parking lot a different way, the Court does not find this to be "evasive driving." Taking a commonsense approach that considers normal human behavior, as the Supreme Court has instructed, the Court does not find turning off a one-way street in order to avoid a car coming the wrong direction down a one-way street toward one's car to be evasive, even if that car is a police cruiser. *Wardlow*, 528 U.S. at 125. The driver's actions in reentering the Dutch Inn parking lot are just as likely consistent with avoiding an accident as they are of criminal activity. Accordingly, the Court does not consider this alleged evasion as a factor which supports reasonable suspicion of criminal activity by Defendant Scott. In conclusion, the Court finds that law enforcement did not have reasonable suspicion of ongoing criminal activity to justify a *Terry* stop of the Defendant.

**B.	There was no probable cause to arrest the Defendant and search him incident to arrest.**

A suspect may only be arrested if law enforcement has probable cause to believe that the suspect has committed or is committing a crime.  *Crockett v. Cumberland College*, 316 F.3d 571, 580 (6th Cir. 2003).  "For a police officer to have probable cause to arrest, there must be 'facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense.'"  *Id.* (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Warrantless searches are *per se* unreasonable, unless the search falls into an exception to the warrant requirement; a search incident to a lawful arrest is one such exception. *United States v. McCraney*, 674 F.3d 614, 618 (6th Cir. 2012).  "This exception authorizes the warrantless search of the arrestee's person and the area within his immediate control" immediately before or after a lawful arrest.  *Id.* at 618-19 (quoting *Chimel v. California*, 395 U.S. 752, 763 (1969)) (internal quotations omitted).  Thus, police were only permitted to search his person incident to arrest if Defendant Scott was lawfully arrested.

Here, law enforcement did not have probable cause to arrest Defendant Scott. Probable cause is a higher standard than reasonable suspicion.  *Florida v. J.L.*, 529 U.S. 266, 272 (2000).  Thus, as the Court has found that the circumstances before the officers did not provide reasonable suspicion that Defendant Scott had committed or was committing a crime, the circumstances certainly do not rise to the level of probable cause to arrest.  As law enforcement did not have probable cause to arrest Defendant Scott, the arrest was unlawful and law enforcement was not permitted to search him incident to that arrest.  *McCraney*, 674 F.3d at 618-19.

## C.   The evidence will be suppressed.

"The fact that a Fourth Amendment violation occurred—*i.e.*, that a search or arrest was unreasonable—does not necessarily mean that the exclusionary rule applies" and evidence seized during the unconstitutional search or seizure will be suppressed. *Herring v. United States*, 555 U.S. 135, 140 (2009). "[A]lthough the Fourth Amendment protects the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, it contains no provision expressly precluding the use of evidence obtained in violation of its commands." *United States v. Buford*, 632 F.3d 264, 270 (6th Cir. 2011) (internal quotations omitted) (quoting *Herring*, 555 U.S. at 699). The "exclusionary rule prohibits the admission of evidence seized in searches and seizures that are deemed unreasonable under the Fourth Amendment." *United States v. Kennedy*, 61 F.3d 494, 497 (6th Cir. 1995) (citing *Wong Sun v. United States*, 371 U.S. 471, 484-85 (1963)).  It "is a judicial remedy that operates 'to deter future unlawful police conduct.'" *Joshua v. DeWitt*, 341 F.3d 430, 450 (6th Cir. 2003) (quoting *United States v. Calandra*, 414 U.S. 338, 348 (1974)).  However, "exclusion 'has always been our last resort, not our first impulse.'" *Herring*, 555 U.S. 140 (quoting *Hudson v. Michigan*, 547 U.S. 586, 591 (2006)).  In the context of unlawful stops by law enforcement, if "[t]he initial *Terry* stop was unlawful [ ] the evidence that resulted from the subsequent search must be suppressed as the fruit of the poisonous tree" unless it falls into "an exception to fruits analysis such as the independent-source rule or inevitable-discovery doctrine." *United States v. See*, 574 F.3d 309, 314-15 (6th Cir. 2009).

The Supreme Court in *Herring* has indicated that courts are to focus on "the efficacy of the rule in deterring Fourth Amendment violations in the future" because "the

benefits of deterrence must outweigh the costs" in order to apply it. *Id.* at 141. "The extent to which the exclusionary rule is justified . . . varies with the culpability of the law enforcement activity"; "the abuses that gave rise to the exclusionary rule featured intentional conduct that was patently unconstitutional." *Id.* at 143. The Supreme Court previously found that "evidence should be suppressed 'only if it can be said that the law enforcement officer had knowledge or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment.'" *Id.* (quoting *Illinois v. Krull*, 480 U.S. 340, 348-49 (1987)). Additionally, "[e]vidence will not be excluded . . . unless the illegality is at least the but for cause of the discovery of the evidence." *United States v. Figueredo-Diaz*, 718 F.3d 568, 574 (6th Cir. 2013) (quoting *United States v. Clariot*, 655 F.3d 550, 553 (6th Cir. 2013)) (internal quotations omitted). In sum "[t]o trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.*

"When police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." *W. Davis v. United States*, 564 U.S. 229, 238 (2011) (internal quotations omitted) (quoting *Herring*, 555 U.S. at 143). On the other hand, "when police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force and exclusion cannot pay its way." *Id.* (internal quotations and citations omitted) (quoting *United States v. Leon*, 468 U.S. 897, 909 (1984); *Herring*, 555 U.S. at 137).

The police misconduct here—conducting a *Terry* stop based on a hunch rather than reasonable suspicion—was the but-for cause of police discovering the firearm on Defendant Scott's person.  Based upon the review of the surveillance video and the facts and circumstances previously discussed, the Court finds that the misconduct amounts to more than isolated negligence.   Additionally, the Court finds that suppression of the evidence would have a deterrent effect.  Accordingly, the evidence will be suppressed.

## IV.   CONCLUSION

Accordingly, for the reasons set forth herein,

**IT IS ORDERED** as follows:

(1)    The Defendant's Motion to Suppress (Doc. # 16) is **granted**;

(2)    The time period between the filing of the Motion to Suppress and this Order is **excluded** from the provisions of the Speedy Trial Act pursuant to 18 U.S.C. § 3161(h)(1)(D);

(3)    The United States **shall file a Status Report within twenty (20) days** from the date of the entry of this Order advising the Court of its intentions in this matter and whether it intends to appeal the Court's decision granting Defendant's Motion to Suppress.

This 2nd day of August, 2019.



Signed By:

*David L. Bunning*    *DB*

United States District Judge